# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**STUART A. LEBOW,**

      **Plaintiff,**

      **v.**                                                   **Case No.  05-2545-JWL**

**MEREDITH CORPORATION d/b/a**
**KCTV-5,**

      **Defendant.**

_____

## MEMORANDUM AND ORDER

Plaintiff Stuart A. Lebow was formerly a news director for defendant Meredith Corporation d/b/a KCTV-5. He alleges that the station unlawfully discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and related Kansas statutes. Mr. Lebow contends that he was the victim of age harassment and discrimination during a period that began around the time KCTV-5 implemented a new management regime and news program format entitled "Live. Late-Breaking. Investigative." and continued until right before Mr. Lebow qualified for long-term disability leave in 2004. This matter is currently before the court on Defendant Meredith Corporation's Motion for Summary Judgment (doc. #48). For the reasons explained below, the court will dismiss certain aspects of plaintiff's claims for lack of jurisdiction based on plaintiff's failure to timely file an administrative charge. With respect to the remaining aspects of plaintiff's claims, the court will grant defendant's motion for

summary judgment in part and will deny it in part.  Specifically, the court will deny

defendant's motion with respect to plaintiff's age discrimination and retaliation claims, and

the court will grant the motion with respect to plaintiff's age harassment claim as well as the

issue of compensatory damages on his discrimination claim.


## STATEMENT OF MATERIAL FACTS[1]

Defendant Meredith Corporation owns and operates KCTV-5, the CBS-television

affiliate serving the greater Kansas City area.  In 1996, the station hired plaintiff Stuart A.

Lebow as a Television Director.  Under the union contract, a Television Director's primary

duties include the following:

> Direct announcements and programs including, but not limited to, the
> operational supervision of audio and video, lighting, scenery, props, overall
> staging, and the final responsibility for having typewritten formats, copy,
> disks, tapes, films, slides, and other physical materials needed in the
> coordination of video and audio elements.

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

Under D. Kan. Rule 56.1, a party opposing a motion for summary judgment must set forth in separately numbered paragraphs any facts not contained in the movant's memorandum unless such facts directly controvert one of the movant's facts.  Instead of following this procedure, in response to defendant's statement of facts plaintiff has included facts which should have been set forth in separate factual statements because they did not directly address the factual statements of defendant to which they purported to respond.  The court has nonetheless included those additional factual statements, to the extent supported by the record and not properly controverted by defendants, in the light most favorable to plaintiff.

A Television Director's duties also include commercial assemblies and production editing. A Television Director's duties do not include operating a studio camera on a newscast except in "bona fide news emergencies."

In Mr. Lebow's performance appraisal dated July 9, 2001, he received a "Meets Expectations" rating.  He received laudatory comments from his supervisor, Dale Jacobson. The performance appraisal stated that Mr. Lebow did "a competent job" of directing the Monday-Wednesday 5:00 p.m. newscast and the weekend a.m. newscast; that he "has been involved in innovations on the weekend with the 5 Min. Chef"; and that "[t]he crew enjoys working with him and the producer appreciates his efforts."  In Mr. Jacobson's remarks, he also praised Mr. Lebow for his commercial production, assembling promotions, and involvement in special projects.

Beginning in early 2002, KCTV-5 management decided to adopt a new format, or "brand" for its local news programming.  This new format was called "Live. Late-Breaking. Investigative."  According to Regent Ducas, News Director at the station, this meant urgent news, i.e., "[t]hat it's a very urgent sense of the day's news."  He further described the news as follows: "No matter what it is, we're going to be there and we're going to have it and investigative in nature."  Kirk Black, General Manager of KCTV-5, testified in his deposition that it meant a "[l]ive, fast paced, late-breaking kind of newscast.  Heavy on lots of graphics, lots of elements."  He said that based on research, the station "developed a plan to change our news product in the way we go out and gather and present news and how we brand it." He explained that "fast-paced" meant "[h]igh story count, high production values, multiple

3

live shots, videos from multiple sources, newscast changing minutes before the show, newscasts changing minutes after the show starts."

As part of this new format, in March of 2002 KCTV-5 introduced a new 4:30 p.m. newscast. Plaintiff originally shared directing duties for this newscast, but, in April of 2002 he was removed from directing duties for this newscast. He was placed on camera duty, an entry-level position, for the evening newscasts and was given the Monday-Wednesday noon newscasts to direct. He was replaced as director for the 4:30 newscast by Jon Gilchrist, who was in his mid thirties. When plaintiff explained that the new schedule would not leave him much time to edit and produce commercial production, the station took Mark Olson, who is twenty-five years younger than plaintiff, off of running the studio camera during the news so that he could do the promotion spots. Plaintiff ran camera for approximately nine months. He was the only director at KCTV-5 who was made to run camera during the newscasts. He testified in his deposition that "[t]here were four or five younger employees in their twenties, late twenties early thirties, that were assigned those productions and I was assigned to run the studio camera."

At the time, Mr. Jacobson's purported justification to Mr. Lebow for his change to cameraman was a staffing shortage. The station later justified Mr. Lebow's reassignment on the grounds that "it quickly became apparent that [Mr. Lebow] did not have the necessary skills to effectively direct this new newscast, which emphasized late breaking news and had frequent interruptions from the planned script." The station contended that plaintiff could better handle the noon newscast, which was a more regularly scheduled newscast with few

4

interruptions and therefore less pressure.  An e-mail from Mr. Jacobson to Chuck Poduska dated May 20, 2002, stated as follows: "During the inauguration of the 4:30-5:00 newscast it became clear that Stu would not be able to direct the show. . . . The fact of the matter is Stu takes longer to prepare for shows than the other directors and if problems arise he has trouble dealing with them."  Mr. Jacobson similarly testified in his deposition that Mr. Lebow was "not real good at adjusting to . . . getting late-breaking news on the air in a clean fashion."  Regent Ducas, News Director at KCTV-5, also believed that Mr. Lebow was unable to deal with last-minute changes.  Yet only days after Mr. Jacobson's May 20, 2002, e-mail to Mr. Poduska, Mr. Lebow was given special recognition for his performance in the employee newsletter.

Mr. Lebow received his next performance appraisal on July 2, 2002.  In it, Mr. Jacobson downgraded his rating to "Below Expectations."  Mr. Lebow was criticized for failing to talk with producers about changes in the show during the week of March 4, 2002, the first week of the newscast.  He had not been confronted about this alleged failing prior to his performance review.  Mr. Jacobson also criticized Mr. Lebow as follows:

> Stu is often unable to roll with the changes that so often happen in newscasts. The difficulty in making last-minute adjustments, has led to newsroom personnel having a lack of confidence in Stu's ability to call a smooth show. Shows directed by Stu generally don't have the pace the station looks for in a newscast.  The newscasts directed by Stu tend to be very fundamental and slow in nature.

On July 7, 2002, Mr. Lebow submitted a written response to his performance appraisal.  In that response he stated, among other things, that he had visited with the 4:30

5

newscast producer and found out that she had no problems with his directing or his communication with her for any broadcast including the production on March 4, 2002. He responded to numerous negative comments made in his performance appraisal and generally conveyed the message that many of those comments were false, pejorative, and had no basis in fact. For example, in his performance appraisal he was also criticized for running the wrong promo spot on May 17, 2002, but he had not worked that day. He stated that the fact that Mr. Jacobson stated that he was not able to roll with the changes "shows me that you failed to talk to the people I work with and displays more judgmental inaccuracies." He explained that he had spoken with two producers who both stated that they had no problem with him directing their shows. He had also spoken with two news anchors who stated that he does a good job and that they had no problems with his directing.

On July 22, 2002, Mr. Lebow's union representative sent a letter to the station concerning his 2002 performance evaluation. The letter stated that Mr. Lebow "believes that he may have been targeted for an unfavorable evaluation because of his age."

On February 25, 2003, Mr. Lebow was reassigned to direct the Monday-Friday morning newscasts. The station states that "[p]laintiff was given this opportunity because it was believed he was ready to direct a longer and more important newscast." He directed the morning show for approximately three months.

In June of 2003, Dawn Alexander took over his position as the morning show director. According to Mr. Lebow, Ms. Alexander had "a lot less experience" than him and was in her late twenties or early thirties. She was hired and "as soon as she was done with her training"

6

only a few months later she took over as the morning show director.  Mr. Lebow was moved

to directing the Wednesday-Saturday noon newscasts, as well as the weekend evening

newscasts.[2]  The station justified the shift change on the grounds that "as the morning show

became more complex with more live shots and other interruptions, Plaintiff was unable to

perform satisfactorily."  According to Stephen DeWalt, who was the news photographer for

the morning show at that time, Ms. Alexander was "awful" as the morning show director;

"[s]he was an entry grade director."

      With the shift change, Mr. Lebow was supposed to be doing more commercial

production.   Yet, despite his known competence in the area, he was not given any

commercials to direct.  Mr. Lebow testified that around this time "all of the assignments were

---

[2] The change in plaintiff's schedule caused problems with his vacation time in June and July of 2003.  Plaintiff contends that management would not recognize his request for leave on June 28th and required him to fly back from Seattle to work one shift, then return to his vacation.  In support of this statement, plaintiff cites to "Ex. 1, Lebow Affidavit."  This affidavit however, does not support this statement.  The only statement in the affidavit pertaining to vacation is that, "[m]y vacation in June 2003, took wife's parents on a cruise to Alaska which left from Vancouver Washington and we flew in and out of Seattle Washington."  The court therefore disregards this factual contention because plaintiff has not cited any evidence of record to support it.

      Plaintiff also contends that he had difficulty with another day off on July 26, 2003.  In fact, the record reveals that the troublesome date was July 25, 2003.  In any event, after bringing the matter to Mr. Jacobson's attention he was allowed to have the day off.  Pl.'s Ex. 45, Vacation Request E-Mails (Bates #D2025).

      Because plaintiff has discussed this evidence in his statement of facts, the court simply makes note of the existence of this evidence in the record.  This evidence is not material to the resolution of defendant's motion because the record does not establish that plaintiff did not receive the vacation time to which he was entitled during 2003.  Indeed, in the argument portion of plaintiff's memorandum in opposition to defendant's motion for summary judgment, plaintiff raises no argument about the significance of the events surrounding his vacation time during the summer of 2003.

given to these younger people in their 20's and 30's and I wasn't given anything." Others made similar observations. Mr. DeWalt, who is in his fifties, testified in his deposition as follows:

> people that had any length of time with Meredith and were over 40 years old were pretty much rounded up, herded out the door. A lot of people were harassed, demoted. There was at least one firing that I know of. And these were all people that had been with the company a long time and had excellent work records.

On July 12, 2003, Mr. Lebow talked to Paula Ruiz in KCTV-5's human resources department. He explained that he felt he was being discriminated against "in regards to Age, Harassment & Retaliation."

On July 18, 2003, Mr. Lebow was placed on probation based on what the station contends was his continued poor performance. In Mr. Jacobson's memo placing Mr. Lebow on probation, he wrote: "Where you have failed to improve is in your efforts to improve the actual on air quality as it relates to your job." Plaintiff points out that he did not receive a performance appraisal in 2003, he had not received any written feedback indicating that his performance was lacking in any regard since his 2002 performance review and, in fact, he had received numerous e-mail praises from Mr. Jacobson during the earlier part of 2003. He had been consistently told that his shift changes were attributable to staffing issues and his expertise. In the probation memorandum, Mr. Jacobson referred to issues on "last Friday's 10 pm show" and "[y]esterday's 4:30 PM newscast." It was believed that the 4:30 newscast error referred to an incident where an error occurred because the producer of the show did not provide scripts until immediately before the show began. The producer in question,

8

Richard Miller, was a much younger individual in his thirties and it does not appear from the record that he was disciplined for the incident.  As to the 10:00 p.m. show, plaintiff was unaware of any problems and the producer of the show had told him, "Nice job.  Good show."  Mr. Lebow contacted Mr. Jacobson to find out more about the alleged performance issues.  Mr. Jacobson responded that he did not know and that he would view an aircheck of the show and let Mr. Lebow know what the problems were, but Mr. Jacobson never responded to Mr. Lebow.

Mr. Lebow believed that the probation resulted from unfair, faulty perceptions and false accusations.  On July 25, 2003, his union representative submitted a letter to the station expressing "extreme concern" about Mr. Lebow being placed on probation.  Mr. Lebow contacted the Kansas Human Rights Commission (KHRC) in early August.  He returned his questionnaire to the KHRC on August 14, 2003.  On that same day, he spoke with Shelly Eggermont, a representative from Meredith's human resources department in Des Moines, Iowa, and told her that "he feels he is being retaliated against because of his age."  Meredith's HR department conducted an investigation into Mr. Lebow's allegations.  The investigator interviewed Messrs. Lebow, Jacobson, and Poduska.  On August 18, 2003, Mr. Lebow wrote a twenty-one page memorandum in which he set forth all of the false accusations made in the probation memorandum and the evidence that he believed proved the inaccuracies.  Ms. Eggermont is listed as one of the recipients of this memorandum.  She did not interview any of the other individuals listed in Mr. Lebow's memorandum or review the documentary evidence discussed in his memorandum.

On September 15, 2003, Ms. Eggermont issued a memorandum to Mr. Lebow regarding his concerns.  She informed him that, "[a]s a result of our investigation, I want to assure you that your work evaluations and shift assignments were based solely on an objective evaluation of your work performance."  The investigation did reveal that Mr. Lebow was indeed the only director who was required to operate a studio camera.  It also confirmed that younger people replaced Mr. Lebow during reassignments and/or shift changes on at least three occasions (Jon Gilchrist, Mark Olson, and Dawn Alexander). Additionally, the investigation revealed at least one incident where management contended that Mr. Lebow was responsible for failing to load a promo swap when in fact there was an e-mail showing that another employee was responsible for the incident.

Mr. Jacobson began to give Mr. Lebow monthly evaluations, assertedly as a plan to improve his job performance.  Mr. Lebow complained in memoranda dated in December of 2003, however, that the monthly meetings constituted age harassment, retaliation, and discrimination.   In a letter dated December 22, 2003, plaintiff's union representative demanded that the station revoke plaintiff's probationary status.  The letter stated that the station had placed Mr. Lebow under a hostile working environment and that he "continues to believe that the Station has targeted him for this discipline due to his age, over 40." Around this same time period, one or two meetings were held with Messrs. Lebow, Poduska, Black, and others.  Also, Mr. Lebow agreed to be placed on a "Performance Improvement Plan."  The station asserts this Performance Improvement Plan was necessary because Mr. Lebow claimed to be unable to understand what he needed to do to improve his performance.

10

Plaintiff contends that these efforts were not really designed to improve his performance, but instead Meredith personnel were simply following Meredith's progressive disciplinary policy. He contends the meetings were designed to document his personnel file to justify his future termination. By December of 2003, it was known that the station's general manager wanted Mr. Lebow gone.

Plaintiff contends that at times his supervisor did not give him enough time to get ready for shows as a form of harassment and retaliation. On at least two occasions he was not told in advance that he was directing a particular newscast. Each incident was the result of a schedule change, and he found out about the schedule change only by happenstance. One of these incidents occurred on November 28, 2003. Plaintiff believed these incidents were a form of harassment and/or retaliation designed to set him up for termination. Also, plaintiff did not initially receive his check from Meredith at the Christmas holidays in 2003, although he did later receive the check.

Unbeknownst to Mr. Lebow, during the later part of June of 2004, Mr. Jacobson was preparing to suspend him for one week without pay on the grounds that his performance had not improved. An e-mail dated June 23, 2004, contains Mr. Jacobson's first pass at a memorandum suspending Mr. Lebow for one week without pay. It concludes: "Failure to improve your performance may result in further disciplinary action, up to and including discharge." This memorandum was intended to be Mr. Lebow's "final written warning." On June 24, 2004, a viewer complaint was logged at 4:29 p.m. In an e-mail from Regent Ducas to Mr. Black, Mr. Ducas attributed the problem to Mr. Lebow. This was erroneous because

11

Mr. Lebow only directed the 10:00 p.m. newscast that day.  Mr. Black advised Messrs. Jacobson and Poduska that Mr. Lebow should not ever do another main show, stating "[w]e must work around him until he is gone!"  Mr. Poduska e-mailed Ms. Eggermont, asking her to revise the suspension memorandum to include this incident.

On July 4, 2004, the breaking news for the day was the ConAgra workplace shooting that left six people dead.  At the time this news broke, Art Salazar, the director for the six and ten news shows, was on lunch break.  As a result, Mr. Lebow directed the news for the majority of the ConAgra story.  He received praises from Messrs. Ducas and Black for his work on the story.

Mr. Lebow had been experiencing serious problems with his health since March of 2004 and had informed the company of his condition.  He suffers from severe migraines almost daily, as well as depression, anxiety, panic attacks, and attention deficit disorder.  Before the anticipated suspension was imposed, Mr. Lebow took a leave of absence for his medical condition.  He currently remains on leave for a long-term disability.

Plaintiff has submitted what he contends is statistical evidence that buttresses his complaints of discrimination.  The statistics are derived from what he contends are supporting documents.  Defendant objects to this evidence on the grounds that it is "nothing more than a set of incomprehensible numbers drawn from unknown sources" unsupported by any meaningful expert analysis.  Although the court is not unsympathetic to defendant's concerns, the court will accept as true, for purposes of resolving defendant's motion for summary judgment, the proposition for which the evidence was intended, which is that a

higher percentage of older employees than younger employees were terminated during the new "Live. Late-Breaking. Investigative." regime.  The court will allow this inference without resolving defendant's objections because this evidence does not sway the court's determination of whether defendant is entitled to summary judgment in any event.  This evidence supports the notion that older employees were treated less favorably than younger employees during the new regime.  But, viewing the evidence in the light most favorable to plaintiff, this fact is already established by the summary judgment record.  Thus, the statistical evidence really does not add much to the factual record.  Moreover, this evidence is not legally relevant because, for reasons explained below, it does not change the applicable burden-shifting framework.

## JURISDICTION

Before delving into the merits of defendant's motion for summary judgment, the court first turns to the issue of jurisdiction.  Defendant alluded to this issue only briefly in a footnote in its memorandum in support of its motion for summary judgment in which defendant contends that plaintiff's claim based on the reassignment in April of 2002 (i.e., the shift change and being placed on camera duty) is barred because plaintiff did not timely file an administrative charge with respect to that incident.  Plaintiff did not respond to this argument.  Despite the cursory record on this issue, the court must satisfy itself that it has subject matter jurisdiction over plaintiff's claims before the court considers the merits of defendant's motion for summary judgment.  *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d

1304, 1318 (10th Cir. 2005) (district court erred in granting summary judgment where the court should have dismissed case based on a lack of subject matter jurisdiction). Given the approaching trial date just over a month away, the court will proceed to decide this matter based on the current record.

A plaintiff's exhaustion of administrative remedies is a jurisdictional prerequisite to suit under the ADEA. *Id.* at 1317. Claims under the ADEA are time-barred to the extent that the plaintiff did not file an administrative charge within three hundred days of the alleged discriminatory act. *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Plaintiff filed his first charge with the KHRC in August of 2003.[3] Therefore, the discriminatory actions on which he bases his claims must have occurred on or after October of 2002. The record reflects that the initial shift transfer and reassignment to camera duty occurred in April of 2002. Because this alleged discriminatory act occurred prior to October of 2002, then, the court lacks subject matter jurisdiction over that aspect of plaintiff's claim. Accordingly, plaintiff's claim based on the reassignment in April of 2002 is dismissed based on a lack of jurisdiction. With this threshold jurisdictional issue resolved, then, the court will proceed to decide the merits of defendant's motion for summary judgment.

---

[3] Plaintiff contends he filed this charge in August of 2003, an argument which is premised on the date he allegedly submitted it to the KHRC. Defendant, on the other hand, contends that the date of the "Received" stamp by the KHRC evidences that this charge was not actually filed with the EEOC until September 16, 2003. For purposes of resolving this motion, however, defendant concedes that the court may use the August of 2003 date because the distinction is immaterial in any event. Either way, the April 2002 shift change and reassignment to camera duty occurred well before the three hundred day window.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

15

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court finds that the record demonstrates a genuine issue of material fact concerning whether plaintiff suffered an adverse employment action that is actionable under the ADEA, whether defendant's proffered justification for its actions is pretextual, and whether plaintiff was subjected to actionable retaliation.

16

Consequently, plaintiff survives summary judgment on his age discrimination and retaliation claims. Defendant is, however, entitled to summary judgment on plaintiff's claim for compensatory damages on his discrimination claim. Defendant is also entitled to summary judgment on plaintiff's age harassment claim because the record does not demonstrate a genuine issue of material fact concerning whether plaintiff was subjected to a sufficiently hostile work environment.

## I.    Age Discrimination Claim

Plaintiff's threshold argument in opposition to defendant's motion for summary judgment is that KCTV-5 engaged in a pattern or practice of age discrimination and, consequently, the applicable burden-shifting framework is the one set forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). In this respect, the court notes that the pretrial order includes a separate pattern-or-practice claim. The *Teamsters* pattern-or-practice method of proving discrimination, however, is not available to individual plaintiffs. *See Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999). "[A] pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Bacon*, 370 F.3d at 575. Nevertheless, an individual may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework.

*Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1227 n.2 (10th Cir. 2006) (pattern-or-practice evidence is admissible in individual cases of discrimination as circumstantial evidence of a defendant's discriminatory animus); *see Bacon*, 370 F.3d at 575 (pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework); *Lowery*, 158 F.3d at 761 (noting such evidence may be useful in an individual discrimination claim to give rise to an inference of unlawful discrimination, or that the employer's articulated reasons for the adverse action was merely pretext, or to establish the employee's ultimate burden).

In this case, then, to the extent that the summary judgment record reflects that KCTV-5 engaged in a pattern or practice of age discrimination, the relevance of that evidence is in the context of plaintiff's individual claim.   Because this is not a class action or collective action, plaintiff does not have a separate, stand-alone pattern-or-practice claim.   Plaintiff may use what he contends is pattern-or-practice evidence to help prove his claim within the *McDonnell Douglas* framework.   But, the applicable burden shifting framework is the traditional *McDonnell Douglas* approach, not the *Teamsters* approach.   *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356 (5th Cir. 2001) (district court did not err in refusing to apply the *Teamsters* method of proof, in lieu of the *McDonnell Douglas* method, to individual claims at the summary judgment stage).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff in an ADEA case bears the initial burden of setting forth a prima facie case of discrimination.   *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998).   The plaintiff must show that he or

she (1) is a member of the protected class, (2) suffered an adverse employment action, (3) was qualified for the position at issue, and (4) was treated less favorably than others not in the protected class.  *Id.*  "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action.  If the defendant does so, the plaintiff must show the defendant's proffered reasons are pretextual."  *Id.*  In this case, defendant contends that (1) plaintiff did not suffer an actionable adverse employment action, and (2) defendant had legitimate non-discriminatory reasons for its actions which were not pretextual.

A.      *Adverse Employment Action*

The phrase "adverse employment action" is liberally defined and is not simply limited to monetary losses in the form of wages or benefits.  *Sanchez*, 164 F.3d at 532.  The court takes a case-by-case approach, examining the unique factors relevant to each situation.  *Id.* Adverse employment action includes "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).   A mere inconvenience or alteration of job responsibilities is not an adverse employment action.  *Id.*  In this case, plaintiff contends that he was subjected to "numerous adverse employment actions," including the following:

> shift changes to less prestigious positions, demotion to entry level duties, job duty changes, disciplinary write-ups and corrective actions, denial of information and training for his job, being placed on a performance plan, being required to write daily critiques of newscasts, being required to "shadow"

interns on editing, ask questions and write reports, being suspended, and harassment.

Turning first to plaintiff's claims concerning shift changes and changes in job duties, for reasons explained previously this court lacks jurisdiction over any claim based on the shift change and assignment to camera duty in April of 2002.  The next reassignment occurred on February 25, 2003, when plaintiff was reassigned to direct the Monday-Friday morning newscasts.  The uncontroverted record reflects that this was a favorable reassignment and therefore it cannot be construed to be an "adverse" employment action.  Then, in June of 2003, Dawn Alexander was given the morning show and plaintiff was moved to directing the Wednesday-Saturday newscasts and the weekend evening newscasts.  Viewing the evidence in the light most favorable to plaintiff, being moved away from the morning show was an unfavorable shift change because KCTV-5 regarded the morning show as a "longer and more important newscast."  Also, although plaintiff was told he would be doing more commercial production work, he was not given any commercials to direct.  Ultimately, however, his job responsibilities essentially remained the same because he continued to direct newscasts.  Thus, the reassignment was nothing more than an alteration of job responsibilities in which plaintiff continued to maintain substantially similar duties without any reduction in pay or status.  *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (purely lateral transfer involving insignificant alteration in job responsibilities is not adverse employment action); *see also Turner v. Gonzales*, 421 F.3d 688, 697 (8th Cir. 2005) (transfer is not an adverse employment action absent evidence that

20

the work was a considerable downward shift in responsibilities); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301-02 (7th Cir. 2004) (transfer without any reduction in pay or status is an inconvenience that does not constitute an adverse employment action); *Hunt v. Rapides Healthcare System, Inc.*, 277 F.3d 757, 771 (5th Cir. 2001) (transfer that involves solely a change in shift, and not a reduction in compensation or change in responsibilities is not an adverse employment action).  Based on the record, the fact that plaintiff was transferred as a director to other newscasts can be viewed as nothing more than a mere inconvenience.  *Cf. Piercy v. Maketa*, 480 F.3d 1192, 1203-04 (10th Cir. 2007) (finding shift-bidding policies that prevented women from getting desirable shifts was not an adverse employment action but were a mere inconvenience).  Consequently, no rational trier of fact could find that this shift transfer constituted a significant change in plaintiff's employment status and therefore defendant's motion for summary judgment on this aspect of plaintiff's discrimination claim is granted.

Plaintiff's age discrimination claim is also based on disciplinary write-ups and corrective actions, being placed on probation, the monthly evaluations during his probationary period, being placed on a performance improvement plan, and the like.  In the specific context of whether a written disciplinary warning rises to the level of an adverse employment action, the Tenth Circuit has focused on whether the warning "effects a significant change in the plaintiff's employment status." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006); *accord Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005) (written reprimand will constitute an adverse employment action

21

only if it adversely affects the terms and conditions of the plaintiff's employment).  For example, in *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998), "the defendant had peppered plaintiff's file with 'twenty warning letters,' and the record demonstrated 'that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction.'" *Haynes*, 456 F.3d at 1224 (quoting *Roberts*, 149 F.3d at 1104).  Thus, "the effect on the plaintiff's employment status was an immediate placement in an at-risk status."  *Id.* at 1224-25; *see also Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (disciplinary write-up constituted adverse employment action where write-up ultimately culminated in the plaintiff's termination).  In this case, viewing the record in the light most favorable to plaintiff, a rational trier of fact could conclude that the write-ups, probation, monthly evaluations, performance improvement plan, etc. essentially fell under the umbrella of Meredith's progressive disciplinary policy and that, at some point, plaintiff's supervisors were following this process for no reason other than to justify his eventual termination.  Not long after plaintiff was placed on probation in July of 2003, he began receiving written monthly evaluations.  By December of 2003, it was known that the station's general manager wanted him gone.  In March of 2004, the station placed him on a performance improvement plan.  In June of 2004, Mr. Jacobson had planned a one-week suspension without pay for him which was intended to be his "final written warning."  A rational trier of fact could conclude, based on this collective evidence, that these actions effected a significant change in plaintiff's employment status—namely, placing his job in an

at-risk status.  Accordingly, plaintiff has raised a genuine issue of material fact concerning whether he suffered adverse employment action by virtue of these actions.

Plaintiff refers to a variety of other alleged adverse employment actions such as the denial of information and training for his job, as well as being required to write daily critiques of newscasts, to "shadow" interns on editing, to ask questions, and to write reports. With respect to these arguments, the court finds that plaintiff has failed to raise a genuine issue of material fact concerning whether any of these actions constituted adverse employment actions.  These allegations are either unsupported by the factual record or they did not cause a significant change in plaintiff's employment status so as to rise to the level of being actionable adverse employment actions.  Of course, to the extent that plaintiff believes that these actions fell under the rubric of being used as a justification for plaintiff's anticipated termination in accordance with Meredith's progressive disciplinary policy, plaintiff may present evidence of these incidents.  But plaintiff has not presented evidence sufficient to raise a genuine issue of material fact that any of these other incidents, standing alone, constituted actionable adverse employment actions.  To this extent, defendant's motion for summary judgment is granted.

B.      Pretext

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action.  In this case, defendant contends that its actions were justified based on plaintiff's poor work performance because he could not handle the pressures created by the station's

new "Live. Late-Breaking. Investigative." format.  Plaintiff does not dispute that defendant

has met its burden under the *McDonnell Douglas* analysis by offering this justification.

Consequently, the burden shifts back to plaintiff to show that defendant's stated reason is "a

pretext for its discriminatory intentions.  A plaintiff demonstrates pretext by showing either

that a discriminatory reason more likely motivated the employer or that the employer's

proffered explanation is unworthy of credence." *Jencks v. Modern Woodmen of Am.*, 479

F.3d 1261, 1267 (10th Cir. 2007) (quotation omitted).  To show that an employer's proffered

nondiscriminatory reason for an employment action is pretextual, "a plaintiff must produce

evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer

did not act for the asserted non-discriminatory reasons." *Antonio v. Sygma Network, Inc.*,

458 F.3d 1177, 1183 (10th Cir. 2006) (quotation omitted).  When assessing whether a

plaintiff has made an appropriate showing of pretext, the court must consider the evidence

as a whole. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

In this case, the evidence as a whole, viewed in the light most favorable to plaintiff,

presents a genuine issue of material fact concerning whether defendant's asserted

justification relating to plaintiff's performance is a pretext for age discrimination.  Not only

did plaintiff himself perceive that many of management's allegations concerning his

performance were unfounded (e.g., he was disciplined for errors that he did not commit and

for errors that were not within his control), but also the investigation conducted by

Meredith's HR department revealed that at least one of the performance allegations against him was unfounded.  Also, plaintiff was replaced by significantly younger employees on more favorable assignments: Jon Gilchrist as director on the 4:30 newscast, Mark Olson in commercial production, and Dawn Alexander on the morning newscast.  And, Ms. Alexander performed poorly on the morning newscast.  Plaintiff testified in his deposition that "all of the assignments [meaning, desirable assignments] were given to these younger people in their 20's and 30's and I wasn't given anything."  The affidavits plaintiff has submitted from other former Meredith employees, when construed in the light most favorable to plaintiff, give rise to an inference of a pattern and practice of age discrimination.  *See Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1227 n.2 (pattern and practice evidence is admissible in individual cases of discrimination as circumstantial evidence of a defendant's discriminatory animus).  Maria Carr, a fifty-two year old who formerly worked at KCTV-5 in Master Control, states that "[y]ounger workers were treated more favorably than older workers.  Younger workers were encouraged and their mistakes were overlooked" when similar mistakes were not overlooked for older workers, and she has given specific examples of this.  Ed Wilming, a sixty-six year old who formerly worked at KCTV-5 as a Photographer, states that older Meredith employees were treated very poorly in comparison to younger workers.  For example, "[m]any of the older people were put on the worst working hours."  Mr. DeWalt, a fifty-six year old, states that he observed many of the older employees "harassed, intimidated, demoted, moved to an overnight shift, unfairly criticized and nit-picked, terminated or otherwise forced out."  He testified in his deposition that

25

"people that had any length of time with Meredith and were over 40 years old were pretty much rounded up, herded out the door.  A lot of people were harassed, demoted."  An affidavit from Teri Schaefer, a fifty-two year old who formerly worked for KCTV-5 as a Reporter, states that "[t]here was a consistent pattern of younger workers given the better time slots and work schedules.  These younger workers were encouraged, brought along and nurtured."  Meanwhile, "[t]he older workers were ignored, harassed and veiled comments [sic] about their work product."  Based on the record, a rational finder of fact could conclude that Meredith's progressive discipline oriented toward forcing plaintiff to leave the company was more likely motivated by age animus than it was by his alleged poor work performance, and that defendant's proffered justification is unworthy of credence.

C.    *Damages*

Defendant also contends that the court should grant summary judgment on plaintiff's age discrimination claim because the ADEA only allows for recovery of unpaid wages and therefore plaintiff cannot establish a compensable adverse employment action because he is still an employee who is on leave of absence status for a long-term disability.  In support of this argument, defendant incorporates an argument from another section of its memorandum in support of its motion for summary judgment in which defendant contends that the ADEA precludes recovery for emotional distress damages.  The court certainly agrees that compensatory damages such as those sought by plaintiff[4] are not recoverable on an age

---

[4] In the pretrial order plaintiff seeks "Compensatory Damages: For physical injury, pain and suffering, future medical, mental anguish, emotional distress, loss of enjoyment of

discrimination claim under the ADEA.  *See Villescas v. Abraham*, 311 F.3d 1253, 1259 (10th Cir. 2002) (noting that it is established law that damages for emotional distress are not available under the ADEA); *Perrell v. FinanceAmerica Corp.*, 726 F.2d 654, 657 (10th Cir. 1984) (district court erred in allowing jury to consider items of damage other than those specifically enumerated in the ADEA); *see also Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 326 n.2 (1995) (noting the circuit courts have unanimously held the ADEA does not permit separate recovery for pain and suffering or emotional distress).  Consequently, the court will grant defendant's motion for summary judgment in part to the extent that plaintiff is seeking compensatory damages on this claim.  As plaintiff points out, however, he is also seeking equitable relief.  *See* Pretrial Order (doc. #45), ¶ 11, at 25.  The ADEA does indeed permit the award of "such . . . equitable relief as will effectuate the purposes of [the ADEA]." 29 U.S.C. § 626(c)(1).  The court does not at this time address the propriety of any of the forms of equitable relief sought by plaintiff because defendant did not present that issue in its memorandum in support of its motion for summary judgment.  Thus, defendant has not shown that summary judgment on plaintiff's entire claim is warranted solely because plaintiff is not entitled to compensatory damages on this claim.  Accordingly, defendant's motion for summary judgment on plaintiff's age discrimination claim is denied with respect to plaintiff's progressive discipline claim.

---

life, and other categories of compensatory damage caused by the retaliatory conduct and retaliatory harassment he suffered."  Pretrial Order (doc. #45), ¶ 10(a), at 25.

## II.   Age Harassment Claim

For a hostile environment claim to survive summary judgment, the plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, *MacKenzie*, 414 F.3d at 1280, and that the harassment stemmed from age-related animus, *Holmes v. Regents of the Univ. of Colo.*, Case No. 98-1172, 1999 WL 285826, at *7 (10th Cir. 1999).  The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective; that is, "the environment must be both subjectively and objectively hostile or abusive." *MacKenzie*, 414 F.3d at 1280.  To evaluate whether a working environment is objectively hostile or abusive, the court examines all the circumstances, including "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Id.*

Applying these principles, the court concludes that the record falls far short of showing age-related harassment.  In support of this claim, plaintiff relies on arguably ageist comments made by some of Meredith's management personnel which another plaintiff in this court presented in his opposition to Meredith's motion for summary judgment in that case, *DeWalt v. Meredith Corp.*, Case No. 05-2544-JWL, in which the court is simultaneously issuing its ruling on defendant's motion for summary judgment.  These remarks are

28

insufficient to rise to the level of an actionable hostile work environment for the reasons stated in the court's Memorandum and Order in the *DeWalt* case. Mr. Lebow's claim based on these statements is even further afield because the arguably ageist remarks in the *DeWalt* case came from Mr. DeWalt's deposition testimony, thus indicating Mr. DeWalt's knowledge that those remarks were made. Mr. Lebow, however, has not directed the court's attention to any evidence in the summary judgment record to indicate that Mr. Lebow himself knew about those statements during the time period when he was allegedly subjected to a hostile work environment. *See Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995) (holding a plaintiff "may only rely on evidence relating to harassment of which she [or he] was aware during the time she [or he] was allegedly subject to a hostile work environment"). Accordingly, those remarks do not support Mr. Lebow's hostile work environment claim for this additional reason.

Plaintiff's more overriding theory in support of his hostile environment claim is based on a culture of ageist discrimination that emerged at the station with the new "Live. Late-Breaking. Investigative." regime. Plaintiff has submitted his own affidavit as well as affidavits from other former KCTV-5 employees in their 50's and 60's which generally reflect that younger employees were treated more favorably than older employees. Mr. DeWalt observed that other employees with longevity at the station were being "herded" out the door or given disadvantageous assignments. Mr. Lebow was assigned to camera duty and replaced on three occasions by younger employees, with him losing status and responsibilities. The record, viewed in the light most favorable to plaintiff, certainly reflects

that younger employees were given better working assignments while older employees were singled out for unfair scrutiny, nitpicked on their job duties and performance, and disciplined for things for which they were not responsible. This evidence, however, does not involve the type of age-related "comments or ridicule that are hallmarks of hostile work environment claims." *Trujillo v. Univ. of Colo. Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998); *accord Holmes*, 2007 WL 285826, at *7. The record does not show that any of these other incidents involved discriminatory intimidation, ridicule, or insult directed at plaintiff himself, *see, e.g.*, *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (no hostile environment claim where general culture at the workplace was one that tolerated racial discrimination and contained a glass ceiling for African-Americans because there was no evidence of racially offensive conduct directed at the plaintiff himself), or any of the other KCTV-5 employees, *see, e.g.*, *Caver v. City of Trenton*, 430 F.3d 243, 263 (3d Cir. 2005) (same, where plaintiff pointed solely to racial comments directed at other individuals); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (noting second-hand harassment is less objectionable than harassment directed at the plaintiff).[5]

---

[5] As discussed previously, this evidence is relevant toward showing pretext on plaintiff's age discrimination claim. It also could be relevant to the contextual analysis of whether discriminatory intimidation, ridicule, or insult is sufficiently hostile. But the court is unaware of any authority to suggest that this "cultural" evidence is sufficient, in and of itself, to provide the basis for a hostile work environment claim in the absence of evidence of meaningful verbal or physical abuse stemming from age-based animus.

In sum, the summary judgment record does not reflect a genuine issue of material fact concerning whether plaintiff was subjected to a hostile work environment.  Accordingly, defendant's motion for summary judgment on plaintiff's harassment claim is granted.

## III.    Age Retaliation Claim

As with defendant's arguments in support of its motion for summary judgment on plaintiff's harassment claim, defendant contends that the ADEA does not allow for the recovery of compensatory damages and, therefore, it necessarily follows that the ADEA does not allow for retaliation claims.  The premise underlying defendant's argument – that compensatory damages are unavailable – presents a closer question in the context of plaintiff's retaliation claim than it does in the context of his discrimination claim.[6]  Even if

---

[6] The court decided the issue of whether compensatory damages are available on plaintiff's discrimination claim because both parties had addressed the issue and because the law is clearly established in the Tenth Circuit that such damages are not available.  The court declines to resolve the analogous issue with respect to compensatory damages on plaintiff's retaliation claim for several reasons.  First, defendant used this argument as a basis to seek summary judgment on plaintiff's retaliation claim itself, not the compensatory damages aspect of that claim.  Second, plaintiff has not responded to defendant's argument concerning the availability of compensatory damages on the retaliation claim.  The court is hesitant to grant summary judgment in favor of defendant without hearing from plaintiff on this issue, especially in light of the fact that defendant did not specifically move for summary judgment on the damages issue itself.  Third, the issue of whether compensatory damages for emotional distress are available on an ADEA retaliation claim is a different issue than whether they are available on the other aspects of plaintiff's ADEA claim.  The Tenth Circuit has not decided the issue of whether compensatory damages for emotional distress are available on an ADEA retaliation claim.  The ADEA incorporates the remedial provisions of the FLSA.  Although the damages available under the FLSA generally are limited to specifically enumerated damages, the damages for a violation of the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), are controlled by a separate provision contained in the second sentence of 29

such damages are unavailable, however, defendant's overriding argument that the ADEA does not allow for retaliation claims is patently without merit. *See MacKenzie*, 414 F.3d at 1278-79 (setting forth legal framework for ADEA retaliation claim); *see also Villescas*, 311 F.3d at 1257 (noting the ADEA contains a separate anti-retaliation provision).

To succeed on a claim of retaliation a plaintiff must show: (1) that he or she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Haynes v. Level 3 Commc'ns, Inc.*, 456 F.3d 1215, 1228 (10th Cir. 2006). Here, defendant contends that plaintiff cannot satisfy the second and third of these elements, i.e., that plaintiff suffered a materially adverse employment action or that a causal connection existed.

*1.    Materially Adverse Employment Action*

A challenged employment action is adverse for the purposes of a retaliation claim if "a reasonable employee would have found [it] materially adverse." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quotation omitted; brackets in original).

---

U.S.C. § 216(b). The Sixth and Seventh Circuits have held that this separate remedial provision which applies to FLSA retaliation claims allows for damages for mental and emotional distress. *Moore v. Freeman*, 355 F.3d 558, 563 (6th Cir. 2004); *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 112 (7th Cir. 1990); *see also Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (affirming jury award for emotional distress damages in FLSA case). Yet, as stated in a well reasoned opinion by United States District Judge Wesley Brown, there may be good reasons to decline to extend this rule to an ADEA retaliation claim. *See Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 994-97 (D. Kan. 2004). This issue must await resolution at trial.

Materially adverse means that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006); *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1265 (10th Cir. 2007) (quoting *Burlington Northern*). Although trivial harms such as "petty slights or minor annoyances" are not actionable, the Supreme Court crafted this new standard in "general terms because the significance of any given act of retaliation will often depend on the circumstances." *Burlington Northern*, 126 S. Ct. at 2415 ("Context matters."). The court must focus on the "materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position" so as to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.*

For the same reasons explained previously with respect to plaintiff's discrimination claim, plaintiff's reassignment away from the morning show in June of 2003 was not a materially adverse employment action. Also for the same reasons explained previously, the summary judgment record reflects a genuine issue of material fact concerning whether a reasonable employee in plaintiff's situation would have found the series of progressive disciplinary actions to be materially adverse.

2.    *Causal Connection*

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse

action." *Haynes*, 456 F.3d at 1228.  Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. *Id.*  Otherwise, "the plaintiff must offer additional evidence to establish causation." *Id.*

Although the court finds that plaintiff's reassignment away from the morning show in June of 2003 was not a materially adverse employment action, the court notes that the reassignment did not constitute actionable retaliation for the additional reason that there is not a sufficiently close temporal proximity between plaintiff's reassignment away from the morning newscast in June of 2003 and his previous complaint of age discrimination.  The last complaint of age discrimination that can be attributed to him prior to that occurred on July 22, 2002, when his union representative sent a letter to the station stating plaintiff believed he was targeted for an unfavorable performance appraisal earlier that month because of his age.  This was approximately eleven months prior and, other than plaintiff being assigned to direct the Monday-Friday morning newscasts on February 25, 2003 (which was a favorable event from plaintiff's perspective), this interim eleven-month period appears to have been relatively uneventful.  This eleven-month period, standing alone, is insufficient to establish causation.  *See id.* (seven-month period will not, by itself, establish causation).

The next arguably materially adverse employment action was plaintiff's being placed on probation on July 18, 2003.  Plaintiff contends that he made a verbal discrimination complaint to Paula Ruiz in Meredith's HR department locally on July 12, 2003.  To establish a prima facie case of retaliation, plaintiff must show, among other things, that the individual who made the decision regarding the materially adverse action had knowledge of plaintiff's

complaint. *Petersen v. Utah Dep't of Corrections*, 301 F.3d 1182, 1188-89 (10th Cir. 2002); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker knew of plaintiff's protected activity at time decision was made).  There is no evidence that Mr. Jacobson, plaintiff's supervisor who placed him on probation, was aware of plaintiff's verbal complaint to Ms. Ruiz.  Consequently, plaintiff has not raised a genuine issue of material fact that his being placed on probation constituted actionable retaliation.

Beginning with the events that transpired in August of 2003, however, there is a sufficient temporal proximity between plaintiff's protected conduct and the materially adverse action to which he was subjected under the company's progressive disciplinary policy.  Plaintiff engaged in protected activity in August of 2003 when he spoke with Shelly Eggermont with Meredith's HR department in Des Moines, Iowa, about the fact that he believed he was being discriminated against based on his age.  He also engaged in protected conduct when he filed his administrative charge with the KHRC in August or September of 2003.  Plaintiff began receiving monthly evaluations (a rational trier of fact could assume under the progressive disciplinary policy) soon thereafter, at least as early as November 21, 2003, which was only approximately two months after the KHRC received plaintiff's administrative charge on September 16, 2003.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (period of two to three months between the protected activity and the alleged retaliatory action was sufficient to establish causation).  After this, a pattern of

arguably retaliatory conduct ensued: the monthly performance evaluations continued; on December 22, 2003, plaintiff's union representative sent the station a letter stating that plaintiff continued to believe he was being targeted for the discipline because of his age; in March of 2004, plaintiff was placed on a performance improvement plan; and, in June of 2004 Mr. Jacobson began preparing a suspension memorandum which was intended to be plaintiff's "final written warning."   The Tenth Circuit has cautioned that the temporal proximity requirement "must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected action] and only culminates later" in an adverse employment action.  *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996); *see also Piercy v. Maketa*, 480 F.3d 1192, 1199 (10th Cir. 2007) (applying this principle from *Marx*).  So, too, a rational trier of fact could conclude that the progressive discipline, which appears to have been intended to result in plaintiff's imminent discharge, began to escalate soon after plaintiff's complaint to HR in Des Moines and the filing of his EEOC charge.  *See Marx*, 76 F.3d at 329 (finding a pattern where defendant began citing plaintiff for job deficiencies within one month of plaintiff's reporting of violation and continued for three months culminating in a demotion eleven months later).  Under these circumstances, the pattern of arguably retaliatory conduct must be regarded as causally connected.  Accordingly, defendant's motion for summary judgment on plaintiff's retaliation claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's claim based on the reassignment in April of 2002 is dismissed for lack of jurisdiction.

36

**IT IS FURTHER ORDERED THAT** Defendant's Motion for Summary Judgment (doc. #48) is granted in part and denied in part as set forth above.  Specifically, the motion is granted as to plaintiff's age harassment claim as well as his claim for compensatory damages on his age discrimination claim; the motion is denied as to plaintiff's age discrimination and retaliation claims.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion to Consolidate (doc. #45) is denied as moot.

**IT IS SO ORDERED** this 4th day of May, 2007.

s/ John W. Lungstrum _____
John W. Lungstrum
United States District Judge